(Slip Opinion)

# Whether the Creation of Natcast Violates the Government Corporation Control Act

The Government Corporation Control Act applies to an agency that brings a corporation into existence, even if the agency does not retain ownership of or control over the corporation.

An agency cannot avoid the strictures of the Government Corporation Control Act by enlisting private individuals as proxies to incorporate an entity that would otherwise violate the Government Corporation Control Act.

The creation of Natcast violates the Government Corporation Control Act because the Department of Commerce exercised undue control over the private persons who incorporated Natcast to oversee Congress's multi-billion investment in the semiconductor industry.

September 2, 2025

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF COMMERCE

The CHIPS Act[1] tasks the Department of Commerce ("Department") with establishing a national semiconductor technology center ("NSTC"). The NSTC functions effectively as an $11 billion investment fund to conduct semiconductor research and development ("R&D") activities, grow the domestic semiconductor workforce, and generate incentives for the growth of the U.S. semiconductor industry. In 2023, notwithstanding the absence of any authority in the CHIPS Act, Natcast was created as a private corporation to operate the NSTC. Several days before the inauguration of the current President, Natcast was funded with up to $7.4 billion of congressionally appropriated funds. You have asked whether the Department's extensive involvement in the creation of Natcast violated the Government Corporation Control Act, 31 U.S.C. §§ 9101–9110 ("GCCA"). On

---

[1] For simplicity and clarity, we use "CHIPS Act" to refer to the Creating Helpful Incentives to Produce Semiconductors for America Act of 2021, Pub. L. No. 116-238, 134 Stat. 3388, as amended by the CHIPS Act of 2022, Pub. L. No. 117-167, 136 Stat. 1366, and codified as amended at 15 U.S.C. §§ 4651–4659. For similar reasons, although the private entity at issue was originally incorporated as "SemiUS," we refer to it by its current moniker, "Natcast."

August 20, 2025, we orally advised you that it did. This memorandum memorializes and further explains the basis for that conclusion.[2]

## I.

"Semiconductors—materials such as silicon with tunable electrical conductivity—are the base for most electronics, enabling construction of complex integrated circuits, or chips, that power advanced technologies for healthcare, communications, computing, and transportation, among other applications." *Semiconductors*, Nat'l Inst. of Standards & Tech., https://www.nist.gov/semiconductors (last visited Aug. 26, 2025). Because semiconductors can be "used in sophisticated military, aerospace, and space programs," the federal government has taken steps such as the CHIPS Act to encourage their domestic development "in conformity with exacting standards and tested to assure a high degree of reliability." *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F.3d 853, 854 (9th Cir. 1997).

## A.

The CHIPS Act instructs the Secretary of Commerce, "in collaboration with the Secretary of Defense" and "[s]ubject to the availability of appropriations," to "establish a national semiconductor technology center to conduct research and prototyping of advanced semiconductor technology." 15 U.S.C. § 4656(c)(1). The CHIPS Act neither specifically authorizes the creation of a new entity to operate that center, nor does it call for the NSTC to be operated independent of the Department. It instead provides that the NSTC "shall be operated as a public private-sector consortium with participation from the private sector, the Department of Energy,

---

[2] Ordinarily, our Office "avoids opining on the legality of past conduct." Memorandum for Attorneys of the Office, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* at 3 (July 16, 2010). Nevertheless, "from time to time we may issue prospective opinions . . . that necessarily bear on past conduct in addressing an ongoing legal issue." *Id.* This is one such circumstance, because whether Natcast was created in violation of federal law could, under certain circumstances, bear on the validity of the Department's ongoing contracts with and obligations to the entity. *Cf. Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999).

and the National Science Foundation." *Id.* The statute lists the NSTC's several functions in section 4656(c)(2), including "[t]o conduct advanced semiconductor manufacturing, design and packaging research," *id.* § 4656(c)(2)(A), "[t]o establish and capitalize an investment fund, in partnership with the private sector . . . with the goal of commercializing innovations that contribute to the domestic semiconductor ecosystem," *id.* § 4656(c)(2)(B), and "to incentivize and expand geographically diverse participation in graduate, undergraduate, and community college programs relevant to microelectronics" in collaboration with various public and private entities, *id.* § 4656(c)(2)(C).

The NSTC was originally overseen by the CHIPS R&D Office, which is part of the Department's National Institute of Standards and Technology ("NIST"). The NSTC is one in a "suite of programs" authorized by the CHIPS Act to "strengthen and revitalize the U.S. position in semiconductor research, development, and manufacturing." *CHIPS for America*, NIST, https://www.nist.gov/chips (last visited Aug. 26, 2025). NIST has dedicated up to $11 billion to develop a robust domestic R&D ecosystem for semiconductors. *Id.*

In April 2023, the Department announced that a not-yet-created private entity would operate the NSTC. To accomplish this aim, it published a notice in the *Federal Register* purporting to "encourage the formation of this independent, non-profit entity" to run the NSTC. *See* National Semiconductor Technology Center Selection Committee, 88 Fed. Reg. 25378, 25379 (Apr. 26, 2023). Specifically, the notice announced the creation of a "Selection Committee" (or "Committee") that would be "responsible for selecting individuals, who will serve as board members and form an independent, non-profit entity that the Department anticipates will serve as the operator of the NSTC." *Id.* at 25378–79. "Through this notice, the Department . . . invit[ed] the public to nominate individuals for the Selection Committee," which it insisted "w[ould] act independently of the Department." *Id.* at 25379. By the end of the summer, the Department had identified five individuals to serve on that Committee, and who would ultimately select the Board of Trustees that would subsequently incorporate and operate the corporation.[3]

---

[3] *See* National Semiconductor Technology Center Selection Committee, 88 Fed. Reg. 57102 (Aug. 22, 2023); *see also CHIPS for America Announces Selection Committee for the*

**B.**

By August 2023, the Selection Committee had identified the Trustees who would incorporate Natcast to the Department's specifications. NIST had publicly "announced [that] the incoming board of trustees" was "expected to oversee a nonprofit entity that w[ould] operate the [NSTC]."[4] Although the original *Federal Register* notice stressed that "[t]he Selection Committee and selected board members will act independently of the Department," 88 Fed. Reg. at 25379, the Department provided to the Board of Trustees a "guidebook," which was designed "[t]o assist and guide the individuals chosen by the Selection Committee . . . to incorporate and serve as the initial trustees of the NSTC Operator." NSTC Operator Organizational and Operational Guidebook 1 (Sept. 29, 2023) ("Guidebook"). Far more than a "how-to" manual, the Guidebook not only directed that "[t]he Board of Trustees' first order of business should be to organize the NSTC Operator as a nonprofit, non-stock corporation in accordance with Delaware law," *id.* at 4, but it also included numerous "[s]pecimen documents"—essentially ready-to-file forms—"to accelerate the formation and organization of th[at] entity," *id.* at 1. These included a certificate of incorporation, *id.* Ex. D, certificate of organizational action by a sole incorporator, *id.* Ex. E, as well as ready-made bylaws, *id.* Ex. F, and an audit committee charter, *id.* Ex. X.

After incorporation, the Guidebook directed that the entity's "next order of business should be to obtain a taxpayer identification number for the NSTC Operator and apply for NSTC Operator's tax-exempt status as a 501(c)(3) entity." *Id.* at 4. Again, the Guidebook provided a specimen application for tax-exempt status. *See id.* Ex. AA. It even included more than a dozen internal policies to be adopted on behalf of the corporation by the Board, including a conflict-of-interest policy, *id.* Ex. H; whistleblower policy, *id.* Ex. J; investment policy, *id.* Ex. O; and code of ethics,

---

*Board of Trustees of the National Semiconductor Technology Center*, NIST (June 20, 2023), https://www.nist.gov/news-events/news/2023/06/chips-america-announces-selection-committee-board-trustees-national (listing Selection Committee members).

[4] *Selection Committee Announces Leaders to Operate the CHIPS for America National Semiconductor Technology Center*, NIST (Oct. 11, 2023), https://www.nist.gov/news-events/news/2023/10/selection-committee-announces-leaders-operate-chips-america-national.

*id.* Ex. T. All of this was designed to "accelerate" the process for the to-be-formed entity to "enter into an Interim Funding Agreement with the Department of Commerce." *Id.* at 1.

Nominally phrased as "recommendations only," *id.*, the Guidebook underscored that "until the NSTC Operator is incorporated," the Department was limited in what assistance could be provided to the nascent nonprofit, *id.* at 11. It appended a factsheet reiterating that the CHIPS Act provided "$11 billion to fund the research and development that will ensure continued U.S. leadership in emerging semiconductor technology," *id.* Ex. B at 1, but the Guidebook emphasized that the Department would be "unable to provide funds for the NSTC Operator's initial organizational expenses" until the entity's initiating paperwork was complete. *Id.* at 11. At the same time, the Guidebook provided robust legal advice—prepared by outside counsel and funded by the Department—to the Board of Trustees about why the Board should use the specimen documents to incorporate in Delaware. *See id.* Ex. C. That advice also explained the trustees' fiduciary obligations under Delaware law, as well as how to obtain tax-exempt status. *See id.*

Predictably, the Board of Trustees generally chose to follow the advice of its Department-provided lawyers. On October 19, 2023, the Board filed a certificate of incorporation for "SemiUS" under Delaware law, which is similar—albeit not identical—to the specimen certificate of incorporation included in the Guidebook. *Compare, e.g.*, SemiUS Certificate of Incorporation art. IV, para. B, *with* Guidebook Ex. D, para. 3. The bylaws filed with the certificate of incorporation as well as other foundational documents for SemiUS also substantially track the exemplars prepared by the Department (or its lawyers). *Compare, e.g.*, SemiUS Certificate of Incorporation § 5.04, *with* Guidebook Ex. F, § 5.04.

Once incorporated, Natcast promptly entered into a base agreement with the Department, and in January 2025, it executed a long-term funding agreement. Because your question focuses on the creation of Natcast itself, the details of this funding arrangement are generally not pertinent. But for context, the funding agreement provides that the Department will give Natcast roughly $7.4 billion to fund the NSTC, and the NSTC will in

turn provide grants to various semi-conductor-related initiatives.[5] We understand that the agreement gives the Department a role in approving certain Natcast projects but that Natcast wields great autonomy in deciding how to spend the money.

## II.

You have asked us whether the creation of Natcast violates the GCCA, which provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. We conclude that it does.

## A.

We start by considering whether the CHIPS Act "specifically authoriz[es]" the creation of a private corporation to oversee the NSTC, *id.*, because if it does, we need not consider the other elements of the GCCA. But it does not. The April 26, 2023, *Federal Register* notice cites—and Natcast's certificate of incorporation largely parrots—two potential statutory authorities: (i) 15 U.S.C. § 4656, which in subsection (c)(1) provides that "the Secretary of Commerce . . . shall establish" the NSTC, which "shall be operated as a public private-sector consortium with participation from the private sector," and (ii) 15 U.S.C. § 4659, which in subsection (a)(1) empowers the Secretary to "enter into agreements, including contracts, grants and cooperative agreements, and other transactions as may be necessary and on such terms as the Secretary considers appropriate." *See* 88 Fed. Reg. at 25380 (citing 15 U.S.C. §§ 4656, 4659); SemiUS Certificate of Incorporation art. IV, para. B (citing CHIPS Act § 9906(c), 15 U.S.C. § 4656(c)).[6] Neither specifically authorizes the creation of Natcast, a private corporation external to the Department.

---

[5] You have informed us that $7.4 billion is the upper limit of the funds that may be transferred to Natcast, although the Department ultimately may allocate less than that total over the course of the long-term funding agreement.

[6] The *Federal Register* notice also cites 15 U.S.C. § 1512, which provides that "[i]t shall be the province and duty of said Department to foster, promote, and develop the foreign and domestic commerce . . . and to this end it shall be vested with . . . such other powers and duties as may be prescribed by law." This excerpted language is not a free-

Although the GCCA "does not elaborate how specific the statutory authorization must be, the manifest purpose of requiring such authorization for formation or acquisition of a corporation is to prevent agencies from finding such a power implied in a *general* grant of authority." Memorandum for Susan S. Engeleiter, Administrator, Small Business Administration, from J. Michael Luttig, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Government Corporation Control Act* at 17 (June 6, 1990) ("SBA Opinion") (emphasis in original). For example, we have concluded that the National Endowment for the Arts' "general gift acceptance authority" does "not specifically authorize creation of a separate entity to engage in fundraising." Memorandum for Karen Christensen, General Counsel, National Endowment for the Arts, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Oct. 30, 1995) ("NEA Opinion") (cleaned up).

The two provisions cited in the *Federal Register* notice confer "undoubtedly broad powers," but they do not "specifically authorize[] establishment of a corporation for the purpose of acting as an agency or instrumentality" of the Department "in carrying out its statutory duties." SBA Opinion at 17. We discuss each provision in turn.

*First*, the reference in section 4656 of title 15 to the private sector does not authorize the creation of a corporation to operate the NSTC. Nothing on the face of that section mentions with precision or distinction the authority to establish a private entity. By contrast, other provisions of the U.S. Code provide ample examples of specific authorizations to establish a corporation. *See, e.g.*, 7 U.S.C. § 5939(b)(1) ("The Secretary shall establish a nonprofit corporation to be known as the 'Foundation for Food and Agriculture Research.'"); 10 U.S.C. § 9462(a)(1) ("The Secretary of the Air Force may . . . establish a corporation . . . to support the athletic programs of the Academy."); 22 U.S.C. § 10602(a)(1) ("[T]he Secretary shall establish the United States Foundation for International Conservation, which shall be operated as a charitable, nonprofit corporation."); 42 U.S.C. § 290b(a) ("The Secretary shall . . . establish a nonprofit corporation to be known as the Foundation for the National Institutes of Health."). On occasion, Congress has also designated an existing corpora-

---

floating grant of power, much less specific authorization to create a corporate operator of the NSTC.

tion to perform acts for an agency. *See* 15 U.S.C. § 3052. Section 4656 is unlike any of these examples. Its general reference to a public-private consortium is not the stuff of which specific authorization is made.

The absence of specific authority is particularly apparent when compared to the CHIPS Act's other provisions, which speak directly to the establishment of private corporations in other contexts. Congress explicitly directed the Secretary of Energy to establish a nonprofit corporation known as the "Foundation for Energy Security and Innovation" for certain purposes. 42 U.S.C. § 19281(b)(1)(A). And while not specifically authorizing the *creation* of a corporation, the CHIPS Act instructed the Secretary of Defense to "undertake a study . . . for optimal public-private partnerships and partnership activities, including an analysis of establishing a semiconductor manufacturing corporation to leverage private sector technical, managerial, and investment expertise." 15 U.S.C. § 4653(a)(6)(C). What Congress did *not* do was authorize the Secretary of Commerce to create a corporation to operate the NSTC. That omission is presumptively intentional. *See DHS v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."); *accord Bittner v. United States*, 143 S. Ct. 713, 720 (2023).

*Second*, section 4659 fares no better. The only provision of section 4659 that even arguably authorizes the creation of Natcast is its statement that the Secretary may engage in "other transactions as may be necessary and on such terms as the Secretary considers appropriate." 15 U.S.C. § 4659(a)(1). This general "other-transaction authority" is, however, the antithesis of a *specific* authorization. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (concluding that there was no "clear congressional authorization" for mass debt cancellation, notwithstanding ostensibly broad statutory language); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2486, 2488 (2021) (per curiam) (concluding that Congress had not "specifically authorized" a nationwide eviction moratorium, even though the statute could have been read to grant the agency "broad authority to take whatever measures it deems necessary to control the spread of COVID-19"). And it falls well short of when our precedent would allow an entity subject to state law to engage in "unmonitored use of federal funds" that were appropriated to pursue federal policies. SBA Opinion at 15–16.

We therefore conclude that the CHIPS Act did not specifically author-ize the creation of a private corporation to oversee the NSTC.

**B.**

Despite lacking specific authorization, the Department "establish[ed] or acquire[d]" Natcast within the meaning of the GCCA. 31 U.S.C. § 9102. Neither term is "defined in the statute, so 'we give [each] term its ordi-nary meaning'" at the time it was enacted. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)); *see also, e.g.*, *Reconsidering the Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions*, 49 Op. O.L.C. ___, *7 (July 11, 2025). In this instance, the Department likely did not "acquire" Natcast within the meaning of the GCCA because it did not obtain a controlling interest in an already-extant entity.[7] Based on the facts provided, however, we conclude that the Department "establish[ed]" Natcast.

**1.**

Congress enacted the GCCA in 1945, Pub. L. No. 79-248, 59 Stat. 597, following a "lengthy congressional inquiry into the practice of creating or acquiring corporations to carry on government business," SBA Opinion at 2. That practice both shielded the expenditure of significant federal funds from congressional oversight and subjected the performance of federal functions to the vagaries of state law. *Id.* at 5 & n.8 (citing S. Rep. No. 79-694, at 13–14 (1945)).

Though the statute's language has changed, its meaning has not. As originally drafted, the GCCA provided in relevant part that "[n]o corpora-tion shall be created, organized, or acquired hereafter by any officer or

---

[7] As we advised, whether and how much the Department maintains control over Natcast's ongoing operations itself presents difficult legal questions. If the Department maintains significant control, that may raise a separate issue under the GCCA. 31 U.S.C. § 9102. If it does not, it may run afoul of the non-delegation doctrine. *See FCC v. Con-sumers' Rsch.*, 145 S. Ct. 2482, 2510 (2025) (finding no constitutional violation because "[i]n every way that matters to the constitutional inquiry, the Commission, not the Admin-istrator, is in control"). We do not wade into that thicket because we need not do so: The Department improperly created the corporation. *Cf. Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2451 (2025).

agency of the Federal Government" to act as that agency's instrumentality without specific authorization by Congress. Pub. L. No. 79-248, § 304(a), 59 Stat. at 602. The GCCA took its current form in 1982, *see* Pub. L. No. 97-258, 96 Stat. 887, when Congress provided that "[a]n agency may establish or acquire a corporation" for such a purpose only with specific authorization, *id.* § 9102, 96 Stat. at 1042 (codified at 31 U.S.C. § 9102). Enacted as part of a "recodification of the law," Congress expressly "stated that the changes should not be interpreted as substantive." NEA Opinion at 2 (citing Pub. L. No. 97-258, § 4(a), 96 Stat. at 1067). As a result, the presumption is that the GCCA's terms have the same meaning today as when they were originally passed. *Revocation of Prior Monument Designations*, 49 Op. O.L.C. __, *14–15 & n.21 (May 27, 2025) (discussing the recodification canon).

In the past, we have repeatedly observed "that an agency cannot be said to *acquire* a corporation unless it holds an ownership interest or exercises legal control." *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212, 216 (2000) ("*NASA Opinion*") (emphasis in original) (quotation marks omitted); *accord* NEA Opinion at 1. Such an interpretation comports with the ordinary meaning of the word "acquire" at the time the GCCA was passed in 1945—namely, "to get as one's own." *Black's Law Dictionary* 41 (4th ed. 1951) ("*Black's Fourth*"); *see also, e.g., American College Dictionary* 11 (1948 ed.) ("*American College Dictionary*") ("to come into possession of; get as one's own"). And that meaning remained consistent when other language in the GCCA was amended in 1982. *See, e.g.,* 1 *Oxford English Dictionary* 115 (2d ed. 1989) ("*Oxford English Dictionary*") ("[t]o gain, obtain, or get as one's own, to gain the ownership of"); *Webster's New Collegiate Dictionary* 10 (1981 ed.) ("*Webster's New Collegiate Dictionary*") ("to come into possession or control of"); *Random House College Dictionary* 13 (1982 ed.) ("*Random House College Dictionary*") ("to come into possession of; get as one's own"); *American Heritage Dictionary* 75 (2d coll. ed. 1982) ("*American Heritage Dictionary*") ("[t]o gain possession of").

Here, however, the relevant verb is not "acquire" but "establish." By coupling those two words with a disjunctive "or," we must presume that Congress expressed related but distinct concepts. *See Encino Motorcars*, 138 S. Ct. at 1141 (citing *United States v. Woods*, 571 U.S. 31, 45 (2013)).

Establishment and acquisition are two ways that the government can become entangled in a corporation, but acquisition typically involves "getting or obtaining something which may already be in existence." *Black's Law Dictionary* 23 (5th ed. 1979) ("*Black's Fifth*"); *accord Black's Fourth* at 41 (defining "acquisition" as the "act of becoming the owner of certain property" and cross-referencing "accession"). By contrast, to "establish" a corporation typically means "to found, to create" or to "bring something into existence." *Black's Fifth* at 490; *Black's Fourth* at 643.

That distinction makes a legal difference. To acquire a corporation, one must typically obtain sufficient stock shares to exercise functional control. *See generally* Lucian A. Bebchuk & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 Geo. L.J. 1453, 1456 (2019). Establishing a corporation, by contrast, does not require the exercise of functional control. In 1945, "[t]o create . . . a corporation [wa]s to make one which never existed before." *Black's Fourth* at 440; *see also, e.g.*, *American College Dictionary* at 284 (defining "create" as "to bring into being; cause to exist"). To "organize" similarly meant to "systematize" or to "put into working order." *Black's Fourth* at 1251. Those who organize or set up a company *may* have a controlling stake in that company—particularly in the beginning. But that will not always be the case, which is why there exist entire industries of investors. *See, e.g.*, Darian M. Ibrahim, *Should Angel-Backed Start-Ups Reject Venture Capital?*, 2 Mich. J. Priv. Equity & Venture Cap. L. 251, 253–54 (2013).

This distinction remained following the 1982 re-codification, which eliminated the words "create" and "organize" in favor of the word "establish."[8] Indeed, the statute's legislative history confirms that this change was merely intended to "eliminate unnecessary words." H.R. Rep. No. 97-651, at 215 (1982); *accord* NEA Opinion at 2.

---

[8] *American Heritage Dictionary* at 465 ("[t]o found"); *Random House College Dictionary* at 452 ("to bring into being on a firm or permanent basis; found; institute"); *Webster's New Collegiate Dictionary* at 388 ("to bring into existence"); *Webster's New World Dictionary* 465 (3d coll. ed. 1988) ("to set up (a government, nation, business, etc.); found; institute"); 5 *Oxford English Dictionary* at 404 ("[t]o set up on a secure or permanent basis; to found (a government, an institution; in mod. use often, a house of business)").

**2.**

The historical context of the GCCA underscores the importance of the difference between acquiring and establishing a corporation. Specifically, the investigation that led to the GCCA's passage reveals that "Congress was focused on agencies that formed private corporations" both because such agency-driven formation "remov[ed] those functions from effective congressional oversight," NASA Opinion, 24 Op. O.L.C. at 217, and because it created an "anomalous situation in which an instrumentality of the Federal Government is technically a creature of a State or local government," S. Rep. No. 79-694, at 13. Because the governing law of a corporation is chosen by the very documents that give that entity life, the latter problem is implicated from the moment a corporation is brought into being—regardless of who exercises control of its operations going forward. *See, e.g.*, Restatement (Second) of Conflicts of Laws § 296 (1971) ("In order to incorporate validly, a business corporation must comply with the requirements of the state in which incorporation occurs regardless of where its activities are to take place or where its directors, officers or shareholders are domiciled.").

**3.**

There is no mechanical formulation for determining whether an agency has established a corporation. The question "must be determined on the facts of each case." Memorandum for Richard Hauser, Deputy Counsel to the President, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: President's Council on Physical Fitness and Sports* at 7 (Feb. 17, 1984) ("*Sports Council*"). If agency employees were to incorporate a corporation within the scope of their government duties, that question would be easy. SBA Opinion at 1, 8–9. But we have recognized that an agency also violates the GCCA when it goes beyond merely "encourag[ing] private parties to form a corporation," NASA Opinion, 24 Op. O.L.C. at 215, and exerts "undue control in setting up a corporation," NEA Opinion at 2.[9]

---

[9] True, our Office has, at times, suggested that this advice was offered simply a matter of "prudence," not statutory edict. *See, e.g.*, Memorandum for Todd Campbell, Counsel to the Vice President, from Richard Shiffrin, Deputy Assistant Attorney General, Office of

Among other factors, we have considered: (i) whether those who incorporated the entity had any "direct or indirect association" with the agency; (ii) the nature and extent of the agency's "support or encouragement" for forming the corporation, keeping in mind that informal encouragement alone typically is insufficient to trigger application of the GCCA; and (iii) the nature and extent of the agency's input into the corporation. NASA Opinion, 24 Op. O.L.C. at 216; *Application of the Government Corporation Control Act and the Miscellaneous Receipts Act to the Canadian Softwood Lumber Settlement Agreement*, 30 Op. O.L.C. 111, 115–16 (2006) ("*Canadian Lumber*").

For example, we considered in our NASA Opinion whether an earnings-sharing agreement between a federal agency and a private corporation violated the GCCA. For several reasons, we concluded that it did not. *See* 24 Op. O.L.C. at 216. In particular, we emphasized that the agency's contractual counterpart "was created by private investors who have no direct or indirect association" and "without any support or encouragement" from the agency. *Id.* We also considered that the entity "adopted its by-laws and charter without any input from" its future federal partner. *Id.* And we noted that the entity "remain[ed] free to make its own business decisions," including "to change its by-laws and charter." *Id.*

### 4.

Each of the three factors identified above weighs in favor of concluding that "officials of the Federal government were actively involved in creating" Natcast. *See Sports Council* at 6. The agency's involvement here far exceeds what our Office approved in our NASA Opinion and what Congress authorized in the GCCA.

*First*, those who incorporated the entity had a strong connection with the Department, even if (in some instances) one step removed. As already noted, the Department published a *Federal Register* notice soliciting

---

Legal Counsel, *Re: Globe Program Advice* at 1 (Nov. 23, 1994). But such urgings of caution arise from "the principle that a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1328 (2024). At some point, an agency's involvement in the creation of a corporation becomes so extensive that the agency will be deemed to have established an entity even if someone else's signature appears on the articles of incorporation.

nominations for a Selection Committee, which would then be "responsible for selecting individuals" to "serve as board members and form an independent, non-profit entity that the Department anticipate[d] w[ould] serve as the operator of the NSTC." 88 Fed. Reg. at 25379. Referenced in that notice was a whitepaper written by Department staff describing the *Department's* vision and strategy for the NSTC, which could be used by the Selection Committee in deciding which individuals to select as board members. *See id.* (citing *A Vision and Strategy for the National Semiconductor Technology Center*, NIST (Apr. 25, 2023)).[10] Put another way, the Department set out its manifesto for the NSTC Operator (which later became Natcast), hand-picked the Selection Committee to choose Natcast's board members, and then delegated its statutory authority to oversee the NSTC to Natcast.[11]

We acknowledge that the April 2023 *Federal Register* notice stated that the "Selection Committee and selected board members will act independently of the Department," *id.*, but this putative independence does not change our view that the Committee acted as an instrumentality of the Department in performing a government function. "[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities," including "the agent's exercise of professional judgment." Restatement (Third) of Agency § 1.01 cmt. c (2006) ("Third Restatement"). What matters is that "the principal initially states what the agent shall and shall not do," even if only in "general terms." *Id.* § 1.01, cmt. f. Here, the Selection Committee was to "identify distinguished,

---

[10] You have explained that this whitepaper incorporated feedback from the Department's Industrial Advisory Committee, one member of which is now the chair of Natcast's Board of Trustees, while another is Natcast's CEO. *See Leadership*, Natcast, https://natcast.org/leadership (last visited Aug. 29, 2025).

[11] At least one Trustee arguably had a more direct relationship with the Department. From mid-2022 through 2023, this Trustee was a senior counselor to the Secretary of Commerce. You have advised us that during that time, this Trustee—then a political appointee at the Department—advised the Secretary of Commerce and other Department components how to implement the CHIPS Act and facilitate the creation of Natcast. As you have described to us, this Trustee helped write the whitepaper and choose members of the Select Committee. The Select Committee then chose this political appointee as one of the entity's Trustees. This political appointee also apparently worked on the Guidebook, signed SemiUS's articles of incorporation, and participated in changing its name to Natcast. This individual remains a Trustee today. These facts underscore the strong and direct connection between the Department and the incorporators.

purpose-driven, visionary leaders for the new independent, non-profit entity," which would "serve as the operator of the NSTC," 88 Fed. Reg. at 25379—an entity delegated the authority to administer billions in government subsidies, *supra* Part I.B. The Department may have declared that the Selection Committee nonetheless does not "perform a Federal Government function." 88 Fed. Reg. at 25379. But that declaration alone does not make it true. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 54–55 (2015) ("*Amtrak*")*.*

*Second*, the Department's support for the creation of Natcast went well beyond informal "encourage[ment]." NASA Opinion, 24 Op. O.L.C. at 215. By publishing its *Federal Register* notice, creating a selection committee, and advertising the necessity of a corporate operator of the NSTC, the Department marshalled government resources—including the funds needed to publish the *Federal Register* notice—to establish a committee that would identify the individuals who would create the new corporation. *See OFR Publishing Services*, U.S. Gov't Publ'g Off., https://perma.cc/8FGA-VFUT (last visited Aug. 26, 2025). The Department provided further support directly to Natcast's Board of Trustees before the entity was incorporated. Although you have shared other examples with us, the clearest illustration is the Guidebook, which was funded by the Department and provided a 249-page blueprint—some of it prepared by private counsel retained at the Department's expense—for how the Trustees should undertake "the initial formation, organization, and operation" of Natcast and thereby "accelerate" the entity's ability to enter a multi-billion contract with the Department. Guidebook at 3; *see also id.* Ex. C (choice of law); *id.* at 12–21 (action items); *id.* at 21–23 & Exs. AA, BB (tax exemption). To the extent further financial incentives were needed to encourage prompt action, the Guidebook expressly refused to fund Natcast's immediate organizational expenses until the corporation was up and running. *Id.* at 11.

*Third*, unlike the facts we considered in our NASA Opinion, the Department here played a role in the drafting of Natcast's foundational documents, including the corporation's bylaws. As we have already discussed, there is a substantial degree of overlap between Natcast's organizational documents and the specimen documents included in the Guidebook—particularly the bylaws. *Supra* Part I.B. We are aware that some degree of overlap might be expected, especially with respect to stock

Delaware corporate law language. *See generally Corporate Forms and Certificates*, Del. Div. of Corps., https://corp.delaware.gov/corpforms/ (last visited Aug. 26, 2025). Such stock language would not, however, cover unique aspects of the NSTC, which is a bespoke consortium authorized by Congress to oversee its investment in semiconductor research and development. *Compare id.*, *with* 15 U.S.C. § 4656(c)(1); *see also, e.g.*, Guidebook Ex. F, § 5.04 (bylaw provision governing qualification of trustees). Even beyond the NSTC-specific language, Natcast's documents look remarkably like the Guidebook's specimen documents. *See, e.g.*, SemiUS Action by Unanimous Written Consent in Lieu of the Organizational Meeting of the Board of Trustees (Oct. 19, 2023), Ex. 3 (conflict of interest policy); *id.* Ex. 4 (whistleblower policy); *id.* Ex. 5 (records retention policy). Under these circumstances, we think the better view is that the Department established Natcast, even if someone else technically signed and filed the articles of incorporation.

**5.**

We understand that our Office nonetheless previously suggested informally to the Department that Natcast's creation satisfied the GCCA—albeit with *significant* caveats regarding the closeness of the question and the magnitude of legal risk. Our Office embraces a "long tradition of general adherence to Executive Branch legal precedent, reflecting strong interests in efficiency, institutional credibility, and the reasonable expectations of those who have relied on our prior advice." *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 177 (2018) ("*Wire Act*"). But reconsideration of our prior views—particularly views expressed in informal discussions but never crystalized in formal, precedential opinions—is entirely appropriate where, for example, we have "identif[ied] errors in the supporting legal reasoning." *Id.* at 177–78. In this instance, our prior informal advice appears to have placed undue weight on the Office's opinion in *Canadian Lumber*, which contains some imprecise statements in dicta that unnecessarily muddy proper application of the GCCA standard. Under such circumstances, reconsideration is appropriate.

In *Canadian Lumber*, we examined a situation in which the United States Trade Representative ("USTR") negotiated a settlement agreement with Canada concerning trade disputes about softwood lumber products.

30 Op. O.L.C. at 112. The settlement provided that the Government of Canada would distribute certain funds to a foundation that would then disburse those funds for various "meritorious initiatives." *Id.* at 112–13. The directors of that foundation were to "be chosen by a bi-partisan group of non-government employees who are identified by USTR." *Id.* at 114 (citation omitted).

Our earlier advice to the Department relied on dicta in *Canadian Lumber*. There, we determined that USTR likely did not establish the foundation because its role was "limited to choosing the bipartisan group that will in turn select the foundation's board of directors," and "the directors in operating the foundation would remain free to adopt and change the foundation's charter and by-laws." *Id.* at 116. But we expressly declined to "answer that question definitively," because "the foundation clearly will not act as an agency." *Id.* (quotation marks omitted). As we will discuss in Part II.C, that is not the case here. As a result, *Canadian Lumber*'s dicta about establishing a corporation should not have been treated as binding Executive Branch precedent. *Cf. Definition of Torture Under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 297, 298 (2004) (dismissing earlier analysis that had been unnecessary to the conclusion); Memorandum for Elizabeth A. Pugh, General Counsel, National Archives and Records Administration, from Walter Dellinger, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Section 11(a) of the President John F. Kennedy Assassination Records Collection Act of 1992* at 1 n.1 (Oct. 17, 1995) (same).[12]

Although dicta can sometimes be informative, the statements from *Canadian Lumber* cannot be squared with the GCCA's text for at least two separate reasons. *First*, even apart from background legal principles, the text of the GCCA prevents an agency from directing a private intermedi-

---

[12] Given the amount of money involved, we would ordinarily be concerned about private party reliance on our prior advice. *See, e.g.*, *Wire Act*, 42 Op. O.L.C. at 180 & n.19. You have, however, advised that of the $7.4 billion that were to be made available for Natcast's use over the life of its contract, only $50 million have actually been drawn down. The only reliance therefore appears to be by Natcast itself. We give such reliance little weight as Natcast's leaders were involved in—and, at times, employed by—the Department's creation of the entity. Letter from Howard C. Lutnick, Secretary, Department of Commerce, to Diedre Hanford, Chief Executive Officer & Trustee, Natcast (Aug. 25, 2025). They were thus presumptively aware of, and voluntarily assumed, the risks of proceeding with that venture.

ary to incorporate an entity that it could not incorporate itself. The GCCA applies to any "agency" that establishes a corporation. 31 U.S.C. § 9102. "Agency" is defined elsewhere in title 31 as "a department, agency, or instrumentality of the United States Government." *Id.* § 101; *see also* SBA Opinion at 8. The ordinary understanding of an "instrumentality" is the "means" by which another entity achieves its goal. *Webster's New Collegiate Dictionary* at 594; *accord* Memorandum for Robert J. Lipshutz, Counsel to the President, from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of Russell Amendment to Purely Advisory Committees* at 5 (June 27, 1979).[13] So, when an agency deputizes private individuals to create a corporation, that creation is imputed to the agency. *See* Third Restatement § 1.01, cmt. c ("[T]he concept of agency posits a consensual relationship in which one person . . . acts on behalf of another person.").[14]

*Second*, as noted above, a corporation is established the instant it comes into existence. Whether the corporation "remain[s] free to adopt and change the foundation's charter and by-laws," *Canadian Lumber*, 30 Op. O.L.C. at 116, may be highly relevant to whether the corporation continues to "act as an agency," 31 U.S.C. § 9102. But if it determined whether the agency *established* the corporation in the first place, the GCCA could *never* be violated based upon the establishment of a corporation because corporations are generally free to amend their bylaws and articles of corporation. *E.g.*, 8 Del. Code § 141(c)(2)(ii). Yet "establish[ment]" remains in the text of the statute and must (if possible) be given some meaning. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). To the extent *Canadian Lumber*'s expansive dicta suggested otherwise, it was wrong and should be disregarded. *Wire Act*, 42 Op. O.L.C. at 177–79; *accord Use of*

---

[13] *See also Random House College Dictionary* at 691 (defining "instrumentality" as "the quality of state of being instrumental" and "a means or agency"); *Black's Fifth* at 720 (defining "instrumental" as "serving as a means or agent; something by which an end is achieved").

[14] Although we are not bound by its opinions, we note that the General Accounting Office concluded nearly thirty years ago that the GCCA "requirement that a Federal agency possess specific authorization to 'establish or acquire' a corporation to act as an agency could not be avoided by directing another organization to act as the incorporator." Letter for Hon. Ted Stevens, U.S. Senator, from Office of the General Counsel, General Accounting Office at 5 (Feb. 10, 1998) (B-278820).

*Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conferences*, 31 Op. O.L.C. 54, 65–66 (2007) (rejecting prior textual analysis based on insufficient attention to statutory structure and context).

## C.

Finally, Natcast certainly "act[s] as an agency" within the meaning of the GCCA. 31 U.S.C. § 9102. In performing this analysis, we consider four factors: (i) "whether the [corporation] was created by the government"; (ii) "the purposes for which [the corporation] was created and the functions it performs"; (iii) "the source of the entity's funding"; and (iv) "the extent of government control over its operations." NASA Opinion, 24 Op. O.L.C. at 219 (citing SBA Opinion at 11–13). In applying this test, we are cognizant that "the practical reality" of an entity's function "prevails over [a] disclaimer of . . . governmental status." *Amtrak*, 575 U.S. at 55 (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995)). Because Natcast was created *by* the Department to perform a function delegated *to* the Department using funds appropriated *for* the Department and subject to some level of supervision *from* the Department, it is in reality an agency *of* the Department.

*First*, for the reasons just discussed at length, Natcast was "created by the government." NASA Opinion, 24 Op. O.L.C. at 219; *see supra* Part II.B.

*Second*, Natcast "was created to perform functions on behalf and for the benefit of the United States." SBA Opinion at 13. That is, Natcast was "created to benefit" the Department, *id.*, by "effectuat[ing] [the Department's] vision and the goals of the CHIPS Act," which would otherwise have to be performed by Department personnel. 88 Fed. Reg. at 25379. And it is, in fact, "actively involved in joint projects with the government, supplementing the activities of the government." *Sports Council* at 7. Natcast's certificate of incorporation effectively admits as much, specifically stating that the "purpose for which the Corporation is formed is to serve as operator of the National Semiconductor Technology Center ('NSTC') as contemplated by [the CHIPS Act]." SemiUS Certificate of Incorporation art. IV, para. B. In language conspicuously (if unsurprisingly) reminiscent of the Department's original *Federal Register* notice, Natcast's original bylaws similarly state that "[i]n order to best effectuate

the Department's vision to establish the NSTC as a once-in-a-generation, transformative center that can endure for decades," it "must have world-class leadership that is visionary, dedicated to the aims of the NSTC, and committed to the public interest." SemiUS Bylaws § 5.04; *see* 88 Fed. Reg. at 25379. Other public facing documents, too, reiterate that Natcast is "designated to operate the [NSTC] by the Department of Commerce." National Semiconductor Technology Center Strategic Plan FY 2025–2027 at 5.

This arrangement is quite unlike prior instances in which we have approved an agency's relationship with a corporation under the GCCA. For example, in our NASA Opinion, the private entity with whom the government contracted "ha[d] its own stake in the arrangement—the production of high-definition television images for its commercial use on the Internet and elsewhere." 24 Op. O.L.C. at 221. Based on the facts as we understand them, Natcast's sole function is to spend federal money by operating the NSTC, and "[n]o private entities profit from [Natcast]'s operations" except through its disbursement of federal monies. SBA Opinion at 13.

*Third*, the source of Natcast's funding confirms our conclusion. "Since the purpose of the Government Corporation Control Act was," at least in part, "to assert greater federal dominion over the financial affairs of entities controlling federal funds, the source of the entity's funding is more important here than it might be in other contexts." *Id.* at 12. In this instance, the Department has made available up to $7.4 billion to Natcast—money that was appropriated under the CHIPS Act to fund the NSTC. We also understand that this funding was exclusive at the time of incorporation; Natcast "receive[d] no contributions from private sources." *Id.* Moreover, you have advised us that to the extent that Natcast will have independent funding in the future, it will be because private corporations will be required to provide such funding as a condition of participation in the CHIPS Act program.[15]

---

[15] Certain CHIPS incentives awards require companies to use commercially reasonable efforts to participate with the NSTC. *See, e.g.*, Micron New York Semiconductor Manufacturing LLC Direct Funding Agreement, Annex D § 3.4.1 (Dec. 9, 2024), https://www.sec.gov/Archives/edgar/data/723125/000072312525000009/ex108nydirectfundingagreem.htm (last visited Aug. 29, 2025). Natcast separately sets the

*Fourth*, the Department retains at least some control over Natcast's operations. *See* NASA Opinion, 24 Op. O.L.C. at 219. The Department may approve or disprove certain Natcast projects, and it reviews Natcast's annual financial plans. *See, e.g.*, Long-Term Agreement Between NIST and Natcast, Inc. §§ 3.03(b), 3.04(d)–(e); Long-Term Funding Order § 3.07(B)(3)(iii)(1)(c). We have seen no evidence, however, that the Department "appoints [Natcast's] Board of Directors," prohibits Natcast from "mak[ing] policy" or requires Natcast to act "consistent with [its] rules, orders, written directives, and other instructions." *FCC v. Consumers' Rsch.*, 145 S. Ct. at 2508 (quotation marks omitted). It is questionable how much practical control this actually gives Natcast. But even if the Department does *not* exercise meaningful control over Natcast, the strength of the other factors overbalances this one to support our view that Natcast acts as an agency. Indeed, the absence of government control can in some instances heighten, not weaken, GCCA scrutiny. After all, "Congress was concerned about the unmonitored use of federal funds and assets by corporations acting on behalf of the government." SBA Opinion at 15–16. Such unmonitored use of public dollars is at work here.

### III.

For these reasons, the establishment of Natcast as the operator of the NSTC violated the Government Corporation and Control Act. Our Office's prior, informal advice to the contrary was incorrect. Both it and the broad dicta upon which it relied are withdrawn and may no longer be cited as precedent of the Executive Branch.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

terms by which companies must cooperate and, if applicable, pay funds as set forth in Natcast's membership agreements.